IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CARL TUEL,                        )
       Plaintiff,              )
                                  )
    v.                          )
                                  )   Case No. 1:11cv405
HERTZ EQUIPMENT RENTAL            )
CORPORATION,                      )
       Defendant.              )

**MEMORANDUM OPINION**

At issue on summary judgment in this personal injury diversity action is whether a lessor of heavy construction equipment – in this instance an aerial work platform (the "Lift") – has a duty in tort to a stranger to the lease regarding an alleged defect in the Lift, when the stranger is injured while operating the Lift without the knowledge or consent of the lessor, contrary to the terms of the lease, and after the expiration of the lease period. Because the record discloses no triable issue of fact concerning the existence of such a duty, summary judgment must be entered in favor of the defendant lessor.

I.

At the time of his injury, plaintiff Carl Tuel, a Virginia resident, was an electrician employed by Shine Electrical Group ("Shine"). Shine was one of several sub-contractors working at a Wal-Mart construction and renovation site in Northern Virginia. Defendant Hertz Equipment Rental Corporation ("Hertz"), a Delaware corporation with its principal place of business in New Jersey, rents heavy construction equipment, including lifts, for short-term and long-term rentals.

1

Hertz leased the Lift to R&R Steel ("R&R"), another sub-contractor on the Wal-Mart construction and renovation site. The parties agree that the lease period ended on April 30, 2009, when R&R notified Hertz that R&R no longer needed to use the Lift and that the Lift was ready for pick-up by Hertz. At that time, R&R moved the Lift to an adjacent lot outside the fenced construction area where equipment was routinely left for drop-off and pick-up by rental companies.

During the night of May 4, 2009, unknown persons moved the Lift back to the worksite without the knowledge or authorization of either R&R or Hertz. When Tuel arrived on site on the morning of May 5, 2009, an employee of a masonry sub-contractor asked Tuel to move the Lift because its location prevented the masonry sub-contractor from performing his work. When Tuel attempted to move the Lift, it malfunctioned, and Tuel claims that he was injured as a direct result of the Lift's malfunction.

On April 21, 2009 and April 28, 2009, during the lease period and prior to Tuel's injury, Hertz sent one of its field technicians to the job site in response to calls from R&R. Prior to the first visit on April 21, 2009, the field technician was told by his Hertz supervisor that the customer was having problems starting the Lift. During the visit, R&R employees informed the field technician that the Lift platform intermittently moved down on its own without, or contrary to, any input from an operator at the control panel. The field technician was not able to replicate this Lift malfunction. After receiving a second notice that the Lift was not functioning properly, the field technician returned to the site on April 28, 2009. During that visit, the field technician was told that at some point during the past few days, the Lift platform had moved up, without, or contrary to, any input from an operator at the control panel. The field technician was again unable to replicate this Lift malfunction.

The lease and second-month lease renewal between Hertz and R&R limited those persons who could use the Lift to the customer, *i.e.*, R&R, or with R&R's permission, "their employer, their employees, fellow employees in the course of such employee's regular employment, or persons approved by Hertz in writing." The lease also instructed R&R to "keep equipment locked and guarded when not in use." A warning on the Lift stated (emphasis in the original):

> DO NOT operate the machine unless you have been properly trained as described in the JLG Operation and Safety Manual by a qualified person and authorized to operate this machine.

The record reflects that, contrary to the terms of the lease, R&R allowed Tuel, an employee of another sub-contractor, to use the Lift during the rental period without Hertz's written or oral permission. No one from R&R gave Tuel permission to operate the Lift on the day of Tuel's injury, which occurred after the lease period had ended.

Tuel has sued Hertz, alleging various negligence theories.[1] Hertz now moves for summary judgment, arguing that the adequately developed factual record discloses no basis on which a jury could reasonably conclude that Hertz owed a duty to Tuel either to warn him of a defect in the Lift or to repair any such defect.

II.

The summary judgment standard is too well-settled to require much elaboration here. In essence, summary judgment is appropriate under Rule 56, Fed.R.Civ.P., only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Importantly, to defeat summary judgment, the non-moving party may not rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Id.* at

---

[1] Tuel has not sued R&R, perhaps because it appears that entity may no longer exist.

324, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the party with the burden of proof on an issue cannot prevail at summary judgment on that issue unless that party adduces evidence that would be sufficient, if believed, to carry the burden of proof on that issue at trial. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. In the words of the Fourth Circuit, "the mere existence of some disputed facts does not require that a case go to trial… [t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995). Furthermore, while a district court must draw all permissible inferences from the underlying facts in the light most favorable to the non-moving party, "those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Id.*

III.

Analysis properly begins with recognition of the well-settled Virginia[2] principle that there can be no actionable negligence unless the defendant owes a legal duty to the person injured or to a class of persons in which the injured person is a member.[3] Importantly,

---

[2] Because this is a diversity action, questions of state law are governed by the forum state's law, including the forum's choice-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Virginia choice-of-law rules, the substantive law governing tort claims is "the law of the place of the wrong." *McMillan v. McMillan*, 219 Va. 1127, 1130, 253 S.E.2d 662, 664 (Va. 1979). Here, because the alleged wrongful conduct occurred in Virginia, Virginia law governs.

[3] *See Kellermann v. McDonough*, 278 Va. 478, 487, 684 S.E.2d 786, 790 (Va. 2009); *Gray v. INOVA Health Care Services*, 257 Va. 597, 599, 514 S.E.2d 355, 356 (Va. 1999); *Dudley v. Offender Aid and Restoration of Richmond, Inc.*, 241 Va. 270, 277-8, 401 S.E.2d 878, 882 (Va. 1991); *Norfolk & W. Ry. Co. v. Wood*, 99 Va. 156, 156, 37 S.E. 846, 847 (Va. 1901). *See also Marshall v. Winston*, 239 Va. 315, 319, 389 S.E.2d 902, 904 (Va. 1990), *quoting Kent v. Miller*,

foreseeability alone is not sufficient for finding a legal duty.[4] As the Fourth Circuit, applying Virginia law, has noted, "[f]oreseeability, it has been many times repeated, is not to be equated with duty; it is, after all, but one factor, albeit an important one, to be weighed in determining the issue of duty." See *Dreisonstok v. Volkswagenwerk, A.G.*, 489 F.2d 1066, 1070 (4th Cir. 1974). In fact, the purpose of the legal duty requirement is to avoid the extension of liability to every conceivably foreseeable accident, without regard to common sense or good policy. See *Jeld-Wen, Inc. v. Gamble by Gamble*, 256 Va. 144, 149, 501 S.E.2d 393, 397 (Va. 1998). But reasonable foreseeability, *i.e.* foreseeability for which there is a reason instead of merely the remote possibility of something occurring, may, in some circumstances, suffice for finding a legal duty. *Id.* at 149. Moreover, the relationship between the defendant and the plaintiff can be a key factor in determining whether the risk of harm to the plaintiff was reasonably foreseeable. *See, e.g., Appalachian Power Co. v. LaForce*, 214 Va. 438, 441, 201 S.E.2d 768, 779 (Va. 1974) (owner of real property owes a duty in tort to invitees but not to unknown trespassers); *Holles v. Sunrise Terrace, Inc.*, 257 Va. 131, 136, 509 S.E.2d 494, 497 (Va. 1999) (defendant's duty in tort to control the conduct of third persons hinges on whether there is a special relationship between the defendant and either the plaintiff or the third person).[5]

---

167 Va. 422, 425-26, 189 S.E. 332, 334 (Va. 1937) ("[T]here is no such thing as negligence in the abstract, or in general... Negligence must be in relation to some person.").

[4] Courts consider numerous factors in determining whether there is a duty in tort, including foreseeability, the relationship between the parties, the defendant's opportunity and ability to exercise care, reasonable expectations of the parties and of society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, and public policies affecting the expansion or limitation of new channels of liability. *See* 57A Am. Jur. 2d Negligence § 79.

[5] While some cases use broad language that may suggest that foreseeability alone can create a duty, a close reading of those cases discloses that the tort duty found rested on the relationship between the parties and not solely on foreseeability. *See, e.g., S. States Grain Mktg. Coop. v. Garber*, 205 Va. 757, 139 S.E.2d 793 (Va. 1965) (plaintiff was an invitee of the defendant);

5

In this matter, the central question is what duty in tort, if any, a lessor owes a stranger to the lease, where the stranger used the leased equipment after the lease period had ended without the knowledge or permission of the lessor or the lessee. It appears that the Supreme Court of Virginia has never addressed this issue. In these circumstances, it is the responsibility of a federal court sitting in diversity to predict how the Supreme Court of Virginia would decide such a case, subject to the general principle that federal courts should not create or expand Virginia's public policy. *See Talkington v. Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 260 (4th Cir. 1998); *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778, 783 (4th Cir. 1995).[6]

### IV.

Tuel alleges essentially four theories of negligence[7], each of which is separately addressed:

(i) Tuel alleges that Hertz supplied the Lift in an unsafe condition.

(ii) Tuel alleges that Hertz negligently failed to inspect, repair, and maintain the Lift properly and failed to respond to notices and warnings that the Lift was malfunctioning.

(iii) Tuel alleges that Hertz failed to warn Tuel and others regarding the dangerous condition of the Lift.

---

*Standard Oil Co. v. Wakefield's Adm'r*, 102 Va. 824, 47 S.E. 830 (Va. 1904) (defendant shipped highly dangerous substance to victim's employer, defendant's customer).

[6] Neither party has sought to have the issue in this case certified for decision to the Supreme Court of Virginia pursuant to Va. Sup. Ct. R. 5:40.

[7] In his complaint, Tuel alleges six theories of negligence, which for purposes of analysis, may be condensed into four broad categories.

(iv) Tuel alleges that Hertz acted negligently once it undertook the task of inspecting and repairing the Lift by failing to inspect and repair the Lift properly or to remove the Lift from use.[8]

A.

Tuel's first theory is easily disposed of given that Tuel has offered no evidence that the Lift was defective at the start of the lease period, nor does Tuel dispute Hertz's assertion that the Lift was not defective at the start of the lease period. Accordingly, there is no genuine issue of fact for trial on this theory.

B.

Tuel's second theory of liability is also easily resolved. While Hertz may have had a contractual duty to inspect, maintain, or respond to problems with the Lift, it had no such duty in tort to either R&R or Tuel. The Fourth Circuit has made this point clear by holding that a lessor's duty to inspect a leased chattel exists, if at all, in the parties' lease; there is no duty in tort to do so. *See Wert v. Jefferds Corp.*, 325 F. App'x. 175, 176 (4th Cir. 2009).[9] Thus, any duty that Hertz would have had to inspect, maintain, or respond to notices regarding the Lift after delivering it to R&R can only be ascertained by looking at the lease, which allocated maintenance responsibilities between Hertz and R&R.[10] And significantly, it is a well-

---

[8] The fourth theory alleges misfeasance, *i.e.* acting in a negligent fashion after undertaking to do an act the actor is not otherwise obligated to perform. This is in contrast to the second theory, which alleges nonfeasance, *i.e.* the omission of an act which a person ought to do.

[9] Although the Fourth Circuit held that there was no tort duty to inspect a leased chattel after delivery, it declined to address as unnecessary the district court's broader holding that a lessor's duties to a lessee were limited to duties in contract and, by implication, that no tort duty arises even when a lessor undertakes to repair a leased chattel after delivery. *See Wert v. Jefferds Corp.*, No. 7:07CV00053, 2008 WL 204479, at *5 (W.D. Va. Jan. 25, 2008).

established principle of Virginia law that failing to fulfill a contractual obligation cannot be the source of a negligence claim. *See Augusta Mutual Insurance Co. v. Mason*, 274 Va. 199, 207-08, 645 S.E.2d 290, 294-95 (2007); *Richmond Metro Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 558, 507 S.E.2d 344, 346-47 (1998); *Glisson v. Loxley*, 235 Va. 62, 67, 366 S.E.2d 68, 71 (Va. 1988). Thus, this alleged theory of tort liability is of no avail to Tuel.

C.

Next, Tuel argues that Hertz had a duty to warn Tuel and others that the Lift was defective pursuant to Section 388 of the Restatement (Second) of Torts, which has been adopted in Virginia. *See Featherall v. Firestone Tire and Rubber Co.*, 219 Va. 949, 962, 252 S.E.2d 358, 366 (Va. 1979).

Until now, Section 388 has been narrowly applied by the Supreme Court of Virginia to manufacturers of products in cases where the product is defective when it leaves the hands of the manufacturer. The Supreme Court of Virginia has not yet extended Section 388 to apply to lessors or to defects that arise after the initial delivery of the chattel. Nonetheless, it must be noted that both extensions are envisioned in the Section's comments. *See* Restatement (Second) of Torts § 388 (1965), Comment C ("These rules… apply to… lessors…. They also apply to one who undertakes the repair of chattel and who delivers it back with knowledge that it is defective because of the work which he is employed to do upon it.").

Even assuming, *arguendo*, that the Supreme Court of Virginia would extend Section 388 in both respects, Section 388 only imposes a duty to warn those strangers to the lease whom the

---

[10] This is congruous with the settled principle that a lessor of real property has no duty in tort to repair property, even if it is obligated by contract to make such repairs. *See Isbell v. Commercial Inv. Associates, Inc.*, 273 Va. 605, 611, 644 S.E.2d 72, 74 (Va. 2007).

lessor "should expect" to use the chattel. *See* Restatement, *supra*, § 388. In elucidating this requirement, the Restatement provides that in order for a lessor to be liable to a stranger to the lease, there must be an "understanding" between the lessor and the lessee that the stranger will use the chattel. *Id.*, Comment A. Thus, even if the stranger to the lease uses the chattel with the consent of the lessee, the lessor is not liable if he had "no reason to expect" that the stranger would be permitted to use it. *Id.*, Comment E.[11] Therefore, in order to survive summary judgment, Tuel must set forth specific facts that would enable a reasonable jury to find by a preponderance of the evidence that Hertz should have expected Tuel to use the Lift after the lease period had ended. Tuel has failed to do this; Tuel has offered no evidence that Hertz expected or reasonably should have expected that the Lift would be moved after the end of the lease term from the pick-up lot to the construction site without the knowledge or authorization of Hertz or R&R and that Tuel would attempt to use the Lift after the lease term had ended without the knowledge or authorization of Hertz or R&R. Although R&R gave Tuel permission to use the Lift on at least one occasion during the lease period, that fact, even if Hertz had known of this permission, would not provide a basis for a reasonable jury to conclude that Hertz should have expected Tuel to use the Lift after termination of the lease.[12]

---

[11] It is worth noting that there is an arguable distinction – perhaps razor thin – between the Section 388 phrase "should expect" and the phrase "reasonable foreseeability." The latter is arguably broader than the former. Reasonable foreseeability connotes that there is a reason for an entity to be aware that an uncertain future event might or could occur. By contrast, noting that an entity "should expect" an event connotes that the entity should be aware that the event will occur. Cases considering Section 388 contain no discussion of this possible distinction, and it is not material in this case because the same result obtains notwithstanding any difference in the phrases.

Tuel's primary argument to the contrary is that Hertz should have expected employees of other sub-contractors to use the Lift because it is common practice on construction sites for sub-contractors to share rental equipment. In support, Tuel provides two expert reports indicating that the practice of sharing during the lease period is common on construction sites and well-known to companies that provide rental equipment.[13] These reports, which address only use during the lease period, are unpersuasive on the question of what Hertz should reasonably expect in this case. The reports and cited testimony provide no evidence that it is common practice to share rental equipment after a lease has been terminated.

In the reports, the experts also argue that the fact that the Lift is operated by a universal key demonstrates that Hertz expected many different sub-contractors to use the Lift. Yet, the access provided by universal keys, a matter of convenience for lessors and their customers, cannot reasonably support an inference that Hertz should have expected unauthorized individuals to use the Lift after the lease period had ended, just as the access provided by an unlocked door cannot reasonably support an inference that a homeowner should expect that a trespasser will enter the home and use the homeowner's kitchen, TV or exercise equipment. Neither Tuel nor

---

[12] There is also no basis for a reasonable jury to conclude that Hertz reasonably expected that Tuel would use the Lift during the lease term, even with R&R's permission, since the terms of the lease limited use to R&R employees unless Hertz provided written authorization, which it did not. Tuel claims that he was an authorized user because the lease provided that "fellow employees" were authorized. This argument fails; the lease correctly construed applies only to employees of R&R and not to employees of other sub-contractors. The President of R&R, the Hertz field technician, and one of Plaintiff's own experts all indicated that they understood the lease to authorize only R&R employees to use the Lift. *See* Pl. Mem. in Opp'n, Ex. 3, 54:5-24; Ex. 2, 156: 11-13; Ex. 14, 9. In any event, even assuming Tuel is correct in his interpretation of "fellow employees", he was still not authorized under the circumstances. Because the lease had ended, no one at R&R had the authority to give permission to others to use the equipment.

[13] Tuel also provides evidence of the common practice through depositions of individuals working on the Wal-mart construction site, but these individuals do not allege that rental companies are aware of the common practice.

the trespasser are authorized to use the equipment. Even though a universal key and an unlocked door may provide access, Hertz and the homeowner only reasonably expect authorized users. Next, the experts rely on a provision in the lease that specifies that R&R would be liable for loss or damage to the Lift that results from unauthorized use. Again, this provision furnishes no basis for a conclusion that Hertz should have expected unauthorized use after the lease had been terminated. To the contrary, it suggests that Hertz expects and insists that R&R will prohibit unauthorized use of the Lift and that R&R departs from this prohibition at its own risk.[14] The experts also allege that Hertz should have expected unauthorized use because other sub-contractors were not warned of the Lift malfunction. This argument fails as it merely assumes the point in issue, namely that Hertz had a duty to warn other sub-contractors about the Lift. Hertz had no such duty because, on this record, there is no evidence that Hertz should have expected their use. Finally, the experts assert that Hertz should have expected other sub-contractors to use the equipment because the other sub-contractors were not aware of the rental contract that prohibited their use. Yet, this assertion fails as it presumes that Hertz should reasonably expect R&R, the lessee, to violate the lease and permit unauthorized use during and, in this case, even after termination of the lease. Neither the existence of the asserted common practice of sharing equipment nor Hertz's possible awareness of it preclude Hertz from inserting terms in the lease that prohibit sharing. R&R, not Hertz, was responsible for ensuring that unauthorized users did not operate the Lift. This is clear from the provisions in the lease that prohibit unauthorized use and require R&R to keep the equipment locked and guarded while not

---

[14] The expert alleges that the lease permits R&R to purchase a Loss and Damage Waiver that limits liability in the case of unauthorized use, but the lease clearly states that R&R would be liable for unauthorized use notwithstanding purchase of a Loss and Damage Waiver, which, in any event, R&R did not purchase.

in use. Thus, Tuel has presented no evidence from which a jury could find by a preponderance of the evidence that Hertz should have expected that Tuel or anyone would use the Lift after the termination of the lease and without Hertz's knowledge or consent.[15]

Tuel offers three additional theories as to why he was an expected user of the Lift, but all three suffer from the same fatal flaws: first, they only relate to the expectations of Tuel and R&R and not to the expectations of Hertz, and second, they only relate to the Lift's use during the rental period and not to the Lift's use after the termination of the lease. First, Tuel argues that he was an authorized user because he had permission from R&R. Despite having R&R's permission, Tuel was not approved by Hertz, and therefore not an authorized user in the eyes of Hertz.[16] Further, R&R had no authority to grant permission to anyone to use the equipment after the end of the lease period. Tuel next argues that he was an expected user because he was certified to use aerial lifts. Tuel's certification is a fact that has nothing to do with whether he

---

[15] Tuel argues that because Hertz left the Lift in the pick-up lot near the construction site for approximately five days after the rental period had ended, Hertz knew this would increase the likelihood that the Lift would be used by someone on the site. This assumes the point in issue: that Hertz should reasonably expect that the Lift would be used after the end of the lease period by anyone. The President of R&R stated in a deposition that once the lease has been terminated, he understood that equipment should not be moved while awaiting pick-up. *See* Pl. Mem. in Opp'n, Ex. 3, 79-80. The record indicates that rental equipment always remains on or near a construction site for some period of time, often days, after the lessee notifies the lessor that it is ready for pick-up. Tuel's own expert seems to suggest that 48 hours would have been a standard amount of time in which to retrieve the equipment. *See* Pl. Mem. in Opp'n, Ex. 13, 8. Tuel has offered no evidence that Hertz should reasonably expect that anyone would use equipment that is awaiting pick-up near a construction site, whether it is there for five days, two days, or two hours.

[16] The Restatement (Second) of Torts clearly distinguishes between permission from the lessee and the expectation of the lessor in the duty to warn context. Even if a third party has the permission of the lessee, the lessor is "not subject to liability for bodily harm caused by its use… if the [lessor] has no reason to expect that such a third person may be permitted to use it." Restatement, *supra*, § 388, Comment E.

was an authorized operator under the terms of the lease or with whether Hertz should reasonably expect that after the termination of the lease, an unauthorized person would remove the Lift from the pick-up lot and return it to the site where it would be used. Finally, Tuel argues that he was an expected user of the Lift because he used it in a manner in which it was intended to be used. This, too, is irrelevant. The manner in which the Lift is used has nothing to do with, and bears not at all on, Hertz's reasonable expectation regarding who might use the Lift and whether anyone would use the Lift following the expiration of the lease period. Indeed, a trespasser who steals a lift from a Hertz parking lot may use the lift in a manner in which it was intended to be used, but surely Hertz should not reasonably expect and be held liable for any resulting injury.

In sum, Tuel has failed to set forth specific facts such that a reasonable jury could find that Hertz should have reasonably expected that the Lift would be moved after the end of the lease term from the pick-up lot to the construction site without the knowledge or authorization of Hertz or R&R and that Tuel would attempt to use the Lift after the lease term had ended without the knowledge or authorization of Hertz or R&R.

D.

Lastly, Tuel argues that Hertz owed a duty to Tuel to act reasonably once Hertz undertook to inspect or repair the leased chattel.[17] The Supreme Court of Virginia has never considered whether a lessor has a duty in tort in this context, and in these circumstances, it is the responsibility of a federal court sitting in diversity to predict how the Supreme Court of Virginia would decide such a case. *See Talkington*, 152 F.3d at 260.

---

[17] Hertz does not dispute that its field technician went to the construction site and attempted to duplicate the reported malfunction, but objects to the classification of its conduct as an affirmative act to undertake repairs. This objection lacks merit as the field technician's actions in inspecting the Lift and attempting to duplicate the malfunction are affirmative acts that could have been performed negligently.

It is true in Virginia that a lessor of real property has no duty in tort to begin repairs, but if it undertakes to do so, then the lessor assumes a duty in tort to make those repairs in a non-negligent fashion. *See Holland v. Shively*, 243 Va. 308, 311, 415 S.E.2d 222, 224 (Va. 1992); *Oden v. Housing Authority*, 203 Va. 638, 640, 125 S.E.2d 843, 845 (Va. 1962). This is based on the "ancient learning" in Virginia that "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Didato v. Strehler*, 262 Va. 617, 628, 554 S.E.2d 42, 48 (Va. 2001). Similarly, although never addressed by the Supreme Court of Virginia, it is also generally true in the law of bailments that a bailor has no duty in tort to inspect or repair bailed property while it is in the bailee's possession, but if the bailor undertakes repairs, it assumes a duty in tort to do so reasonably. *See* 8A Am. Jur. 2d Bailments § 180.

Thus, these principles suggest that a lessor has a duty in tort to act reasonably in the event it undertakes repairs to leased chattel even when it has no obligation to do so.[18] As in the duty to warn context, though, this duty extends only to the lessee and to those strangers to the lease whom the lessor should reasonably expect to use the chattel. This is evident by examining the relevant statutes and common law principles. First, in abolishing the privity requirement, the General Assembly of Virginia eliminated lack of privity as a defense in a negligence suit against a lessor of goods where, unlike here, "the plaintiff was a person whom... the lessor might reasonably have expected to use, consume, or be affected by the goods." Va. Code Ann. § 8.2A-216. Thus, there is still a common law bar to negligence suits when the lessor of goods did not reasonably expect the plaintiff to use, consume, or be affected by the goods. Outside of Virginia,

---

[18] Note however, the contrary ruling in the *Wert v. Jefferds Corp.*, No. 7:07CV00053, 2008 WL 204479 (W.D. Va. January 25, 2008). *See supra* note 9.

this application is confirmed in the context of bailments, where a bailee who fails to exercise reasonable care in repairing bailed chattel is only liable to "one whose person or property may reasonably be expected to be endangered by the probable use of the chattel after the making of the repair." 8A Am. Jur. 2d Bailments § 176. And, in a somewhat analogous context, an owner of real property owes no duty of care to the unexpected trespasser, but the owner does owe a duty of care to a trespasser whose presence is known or ought to be known, such as when the trespasser was seen on the property. *See Norfolk Southern Ry. Co. v. Fincham*, 213 Va. 122, 126, 189 S.E.2d 380, 383 (1972).

In sum, Tuel has failed to set forth specific facts such that a reasonable jury could find that Hertz reasonably expected that after the termination of the lease, an unauthorized person would remove the Lift from the pick-up lot and return it to the site where it would be used. *See supra* Section C. Thus, on this record, Hertz owes no duty in tort to Tuel.

V.

For the foregoing reasons, summary judgment must be granted in defendant's favor. An appropriate order will issue.

Alexandria, Virginia
September 16, 2011

/s/
T. S. Ellis, III
United States District Judge

15